UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CELINE G. SUCHANEK                          Civ. No. 07- 4656 (JMR/JJG)

       Plaintiff,

v.                                          **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE
Commissioner of Social Security,

       Defendant.

JEANNE J. GRAHAM, United States Magistrate Judge

     Plaintiff Celine Suchanek seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner"), who denied her application for

Social Security Income ("SSI") under the Social Security Act, 42 U.S.C. § 423.  This

matter is before the Court on Plaintiff Celine G. Suchanek's ("Suchanek") motion for

summary judgment [Docket No. 8], and on Defendant Commissioner of Social Security's

("Commissioner") cross motion for summary judgment [Docket No. 14].  The motions

are referred to this Court for a report and recommendation in accordance with 28 U.S.C.

§ 636 and D.Minn. L.R. 72.1.  Suchanek is represented by Paul Mundt, Esq.  The

Commissioner is represented by Lonnie F. Bryan, Assistant United States Attorney.

## I.     BACKGROUND

     Suchanek was twenty-three years old on July 23, 2004, when she filed her

application for Supplemental Security Income.  (Tr. 62-65).  She was born in the

Netherlands, and moved to the United States in 1988.  (Tr. 246).  She has a high school

education, and has completed her Associates Degree.  (Tr. 261).  She is continuing her

education at the Minnesota State University, Mankato, with certain accommodations for residence and academic course work, based on her health conditions.  (Tr. 307).  She has been diagnosed with obsessive-compulsive disorder, nonverbal learning disorder, history of eating disorder, probable history of depression, osteoporosis, and mitral valve prolapse.  (Tr. 233).  She alleges that she has been unable to work as of December 1, 2002.  (Tr. 62).

### A.    Medical Records

In November 1993, when she was thirteen years old, Suchanek was admitted to the University of Minnesota Hospital for treatment of a severe eating disorder.  (Tr. 156-163).  While hospitalized for five-and-a-half months, she was also treated for obsessive compulsive disorder ("OCD"), and for gross and fine motor deficiencies.  (Tr. 157-58).  Occupational therapy staff believed Suchanek met the criteria for developmental coordination disorder and sensory integrative disorder.  (Tr. 158-59).

In September 1994, Suchanek was referred to Dr. Wayne Samuelson for a psychological consultation.  (Tr. 169-72).  Neuropsychological test results indicated that Suchanek was of average general intellectual functioning.  (Tr. 170).  She showed deficits in fine motor skills, and mild to moderate visual perceptual problems.  Id.  Her gross motor skills were also deficient.  Id.  Suchanek had significant difficulties with attention and concentration, especially with rapidly presented tasks.  Id.  Dr. Samuelson opined that Suchanek's difficulties suggested a wide-spread underlayment of problems, with probably more right hemispheral dysfunction than left.  (Tr. 171).

After high school, Suchanek became a student at Normandale Community College, and Dr. Thomas Siefferman wrote a letter to the Student Needs Coordinator,

explaining Suchanek's difficulties with balance, fine motor skills, and fatigue.  (Tr. 179-80).  Dr. Siefferman opined that Suchanek would need help with motor skills, and assistance with fine motor skills, such as writing for long periods of time.  Id.

Suchanek began treating at Southwest Family Services in September 2000. (Tr. 183-205).  She was diagnosed with obsessive-compulsive disorder, anxiety disorder, NOS, and anorexia nervosa.  (Tr. 202).  Her treatment goals were to decrease her obsessive thoughts and compulsive behaviors, not to exhibit symptoms of anorexia, and to manage her anxiety.  (Tr. 204).

Dr. Cari Eggert, a neurologist, evaluated Suchanek at Mayo Clinic in December 2002. (Tr. 248-50).  Suchanek sought evaluation of long-standing muscle fatigue, unusual gait, and exercise intolerance.  (Tr. 248).  Dr. Eggert described Suchanek as a quiet, thin female, who appeared somewhat childlike and deferred to her parents to answer questions.  (Tr. 249).  On examination, her gait was slightly abnormal, but her coordination, strength, and muscle tone were normal.  Id.  Dr. Eggert opined that Suchanek's underlying neurologic disorder was unclear, and recommended an MRI of the head, neuropsychiatric testing, and follow-up with Dr. Brian Crum.  (Tr. 249-50).

Suchanek and her parents reported to Dr. Crum that Suchanek was doing well academically in college, but that she is much slower than others her age.  (Tr. 246). She walks slower, and is uncoordinated.  Id.  She has failed a driving test four times.  Id. Dr. Crum noted Suchanek to be very childish in her behavior.  (Tr. 246-47).  She was very thin, and almost cachetic.[1]  (Tr. 247).  Dr. Crum felt the main question was whether

---

[1]     Cachetic relates to cachexia, which is general weight loss, and wasting occurring in the course of chronic disease or emotional disturbance.  STEDMAN'S MEDICAL DICTIONARY 265 (27th ed. 2000) ("STEDMAN'S").

Suchanek had an underlying neurologic disorder.  (Tr. 247).  He recommended additional testing.  Id.

Suchanek underwent psychometric testing with Dr. Mary Machulda, and a psychiatric evaluation with Dr. Daniel Hall-Flavin at Mayo Clinic later that month. (Tr. 239-45).  Dr. Hall-Flavin noted a small venous angioma[2] on the MRI of Suchanek's head, and noted that there was no evidence of active myopathy[3] on EMG.  (Tr. 240). Psychometric testing revealed significant discrepancies between Suchanek's verbal and nonverbal learning patterns.  Id.  She demonstrated borderline auditory attention span, and marked difficulties in informational processing speed and motor function.  Id.  Her abstract reasoning and problem-solving skills were mildly impaired, but her verbal abilities were essentially normal.  Id.  Dr. Hall-Flavin opined that "[t]here appears to be specific localization of her nonverbal difficulties to the right hemisphere . . . it was Dr. Mary Machulda's opinion that this likely represented a learning disability associated with psychomotor problems and difficulties in social functioning."  Id.  He recommended additional psychiatric and neurologic testing.  (Tr. 241).

Suchanek was referred to Dr. Donald McAlpine at Mayo Clinic for further psychiatric testing in January 2003.  (Tr. 236-38).  Dr. McAlpine noted that Suchanek's parents were concerned that she had stalled out in her development, and that she would not be able to take care of herself as they age.  (Tr. 236).  She can not drive, she spends hours a day on checking behaviors related to obsessive-compulsive disorder, neglects her eating, and has had life-long problems with motor development.  (Tr. 236).

---

[2]        Angioma is a swelling or tumor due to proliferation of the blood vessels or lymphatics. STEDMAN'S AT 83.

[3]        Myopathy is an abnormal condition or disease of the muscular tissues.  STEDMAN'S at 1175.

Dr. McAlpine assessed Suchanek with a GAF score of 45.[4]  (Tr. 238).  He opined:

> This is a very complex business because she does have
> some deficits and may need some longer term sheltered
> living environment or assisted living.  It might even be
> helpful at some point to have her do an occupational safety
> evaluation, and I will recommend that to get a better idea of
> just what things she is literally incapable of doing on her
> own.

(Tr. 238).

Suchanek followed up in neurology with Dr. Crum on the same day.  (Tr. 235).

Dr. Crum reviewed all of Suchanek's laboratory studies, MRI and EMG.  Id.  None of the

results were remarkable.  Id.  Dr. Crum opined:

> It appears that Celine has a nonverbal-type learning
> disorder.  This would explain a number of the findings on
> her neuropsychometric testing and also likely explains
> some of the motor incoordination and motor development
> problems and obsessive-compulsive disorder.  This does
> not seem to fit in other disorders in that realm such as
> autism or Asperburger's disease.

(Tr. 235).  No further neurological testing was necessary.  Id.

In April 2003, Suchanek was referred to Psychiatrist Katherine Moore at Mayo

Clinic.  (Tr. 230-33).  Dr. Moore noted that she would follow up with the issue of

"the patient's 'general picture of apathy, passivity and dependence."  (Tr. 230).

Dr. Moore noted that in Suchanek's interview with Dr. McAlpine, she was ambivalent

about making any changes to her situation of living with her parents, being minimally

socially active, and not making steps toward independence.  (Tr. 230).  Dr. Moore

assessed a GAF score of 55.  (Tr. 232).

---

[4]        "[A] [Global Assessment of Functioning] GAF score in the fifties may be associated with
moderate impairment in occupational functioning, and a GAF score in the forties may be associated with a
serious impairment in occupational functioning."  Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007)
(citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th
ed. text revision 2000).

On the same day at Mayo Clinic, Suchanek was evaluated for anxiety by Sara Kalsy and Dr. Jonathon Abramowitz.  (Tr. 226-29).  Suchanek reported feeling anxious with unfamiliar people, and anxious about how she appears to them.  (Tr. 226).  She has difficulty dealing with social uncertainties, but denied that her social anxiety limited her functioning because she has friends, and can interact with others at school.  Id.

Suchanek also reported inability to control intrusive thoughts, such as having touched something that was contaminated.  Id.  This leads her to excessive washing and cleanliness.  Id.  At night, she has intrusive thoughts about whether the doors are locked, the refrigerator door is closed, and the lights turned out.  Id.  She gets up repeatedly to check these things, and this delays her sleep schedule for several hours.  Id.  She has intrusive thoughts of harming herself or others, but would never act on it.  Id.  She denied symptoms of depression, and described herself alternately as "numb" and "content." (Tr. 227).  Dr. Abramowitz assessed a GAF score of 50-55.  (Tr. 228).

Suchanek met with Dr. Christine Sadowski, a psychologist at Mayo Clinic, on May 19, 2003.  (Tr. 225).  Dr. Sadowski described Suchanek as "a slightly socially anxious young women [sic] whose demeanor made her appear younger than her stated age."  Id.  Dr. Sadowski proposed to treat Suchanek for OCD symptoms, but Suchanek did not follow through.  (Tr. 225, 221).

Suchanek saw Dr. Moore again on August 12, 2003.  (Tr. 222-24).  Dr. Moore noted that Suchanek's parents expected her to start looking for a job.  (Tr. 222). Dr. Moore opined that Suchanek's lack of motivation to make significant changes made her treatment planning difficult.  (Tr. 223).  Dr. Moore recommended that Suchanek be given increased responsibility for basic tasks at home.  Id.  Dr. Moore also started

Suchanek on a trial of Seroquel, an atypical antipsychotic medication to treat OCD symptoms.  Id.

Suchanek returned to see Dr. Moore on March 23, 2004, and reported that she was looking for a job, but did not have any offers.  (Tr. 217-19).  She was also helping out around the house.  Id.  Her only socialization was attending a weekly bible study.  Id. Although Suchanek and her father reported that she had fewer OCD symptoms, Suchanek told Dr. Moore that she feared sharing public bathrooms, feared eating in front of people, and has occasional, upsetting intrusive thoughts.  Id.

Dr. Moore noted that Suchanek and her parents did not seem particularly interested in pursuing psychotherapy, which Dr. Moore felt was needed for separation issues and OCD symptoms.  (Tr. 218).  Dr. Moore recommended that Suchanek seek some volunteer work.  Id.

Suchanek underwent a psychological consultative examination with Dr. Glenn Holmen on November 17, 2004, at the request of the Social Security Administration. (Tr. 258-65).  Suchanek reported she can function better when there is no pressure to do tasks quickly.  (Tr. 261).  She described having a positive experience working at the Burnsville Public Library during 1999 and 2000.  Id.  She left this job when she enrolled in Normandale Community College.  Id.

With respect to social activities and hobbies, Suchanek reported that she likes to participate in bible study groups, she enjoys music, enjoys writing lyrics, and exploring the internet.  (Tr. 262).  Her daily routine involves getting up between 8:00 and 11:00 a.m., eating, cleaning the kitchen, and showering and getting dressed.  (Tr. 262).  During the day, she helps her father with tasks around the house.  (Tr. 262-63).  She sets the table

for dinner, and watches television in the evening.  (Tr. 263).  She goes to bed and reads, sometimes late into the night.  Id.

Suchanek reported that she doesn't have difficulty cleaning, but it takes her a long time to cook.  Id.  She likes walking, and takes the dog for walks.  Id.  She socializes with people she has met in church or bible study, and she occasionally goes out to eat with people from bible study.  Id.

On mental status examination, Suchanek said she no longer has destructive thoughts, and she is not afraid to use a public bathroom.  Id.  She is apprehensive about scheduling, timing, and being rushed.  Id.  She reported being less self-conscious about what others think, and less anxious about meeting people.  (Tr. 263-64).

Dr. Holmen diagnosed obsessive-compulsive disorder, history of atypical eating disorder, parent-child relationship problems (separation issues), early stage osteoporosis [from review of Suchanek's medical records] and a GAF score of 49.  (Tr. 265). Dr. Holmen opined that Suchanek could concentrate on and understand verbal instructions; she has the mental capacity to carry out basic tasks that are repetitive, with reasonable persistence, but at a reduced pace; she would probably have difficulty with anxiety if asked to work with the public; she would be expected to do reasonably well if working with a limited number of co-workers and supervisors; she would be more reactive to criticism or conflict; and she would be expected to have limited tolerance for stress in the workplace.  Id.

Dr. Patrick Shields completed a Psychiatric Review Technique Form and a Mental Capacity Assessment form for the Social Security Administration on December 15, 2004, which was affirmed by Dr. Sharon Fredrickson.  (Tr. 270-87).

Under the "B" criteria of Listing 12.06 for anxiety disorders, Dr. Shields opined that Suchanek was mildly impaired in activities of daily living; and moderately impaired in maintaining social functioning and maintaining concentration, persistence or pace; and that she had one or two episodes of decompensation of extended duration.  (Tr. 280).

Suchanek underwent a vocational evaluation at KCQ, Inc., on April 29, 2005. (Tr. 126-31).  As part of the evaluation, Suchanek worked at two different sites, a bookstore, and a financial aid office.  Tr. 128-29).  A third site was not attempted, due to concerns with her fragile health.  (Tr. 129).  With respect to work rate, the evaluators noted Suchanek's rate to be below average at both sites, even after the third day at the site.  (Tr. 130).  They noted, "[Suchanek] was lethargic and seemed to struggle due to her fragile health.  This would cause her work rate to be low."  Id.  Suchanek shelved books at a 65% productivity level, faced items at a 75% productivity level, and filed at a 45% productivity level.  Id.  The evaluators concluded that Suchanek has potential for a variety of careers, but she does not have a good work tolerance at this time, and they do not advise that she enter the workforce until issues with her current state of health are resolved.  (Tr. 131).  The evaluators opined that Suchanek would initially need a job coach, with ongoing job coaching if there were to be changes in duties, or additional duties added.  (Tr. 127).

On August 17, 2005, after being rejected twice for social security disability benefits, Suchanek saw Dr. Brian Crum at Mayo Clinic for evaluation of her motor abilities.  (Tr. 301-03).  Dr. Crum noted that Suchanek had been doing quite well since he last saw her.  (Tr. 301).  She had plans to start school in Mankato to study to become a social worker.  Id.  She reported that she would live at the dorm four days a week, and

with her parents on the weekends.  (Tr. 301-02).  Dr. Crum noted that Suchanek was

seeing a psychologist, Pam Jacobel, in Northfield.  (Tr. 302).  He also noted that

Suchanek could take care of her activities of daily living, from a motor standpoint.  Id.

Dr. Crum felt it would be reasonable for Suchanek to be evaluated in the Physical

Medicine and Rehabilitation Department.  (Tr. 302).

Suchanek saw Dr. Moore on the same day, (Tr. 299-301) and Dr. Moore noted

that Suchanek was attending an eating disorders support group through her church.

(Tr. 299).  She also noted that Suchanek attends church and bible study, and volunteers at

the Senior Center in Northfield once a week.  Id.  Suchanek struggled with, and could not

keep jobs at a clothing store or a theater.  Id.  Suchanek planned to attend a university in

Mankato, and live on a "quiet floor" in a single room, which her contamination and

eating concerns would have precluded in the past.  (Tr. 300).

Dr. Moore noted that Suchanek's mood was brighter than on the last visit, but her

affect and interaction appeared slightly awkward.  Id.  Although Suchanek and her

parents denied profound difficulties with OCD and eating disorder symptoms, Dr. Moore

stated, "clearly, she continues to have some degree of difficulty related to these."  (Tr.

301).  Dr. Moore stated:

> While the OCD and eating disorder NOS diagnoses are
> more recognizable, Celine's ongoing difficulties appear to
> be related to the nonverbal learning disability spectrum
> disorder.  Difficulties related to this span the cognitive,
> psychiatric/social, and physical realms, and hopefully
> records documenting that original diagnosis from 2002, as
> well as her more recent evaluations will be helpful in her
> social security disability application.

(Tr.  301).

On October 31, 2005, Suchanek met with Dr. Brian Grogg in the Physical Medicine and Rehabilitation Department at Mayo Clinic.  (Tr. 297-98).  On examination, Suchanek had notable thoracic kyphosis.[5]  (Tr. 297).  Her rate of walking was slightly slow, and she was limited in rapid alternating movements of both upper and lower limbs.  Id.  Examination was otherwise unremarkable.  Id.  Dr. Grogg thought it would be reasonable to obtain more objective testing of her motor impairments.  (Tr. 297-98).

Dr. Grogg wrote a "To Whom It May Concern" letter describing his May 25, 2006, evaluation of Suchanek, noting that she had undergone a standardized driver's evaluation and a standardized physical performance evaluation.  (Tr. 289).  Dr. Grogg opined:

> [T]he patient has significant physical limitations as far as decreased reaction time, decreased ability to initiate tasks, and impaired hand-eye coordination.  This results in significantly limited options from an employability standpoint and likely means the patient will not be able to drive in the foreseeable future.  I do not believe the patient will be able to gain any type of meaningful employment in the foreseeable future.  Therefore, I recommend that the patient be considered medically disabled.

(Tr. 289).

Upon review of the results of Suchanek's standardized driver's evaluation and standardized physical performance evaluation, Dr. Grogg noted that Suchanek's had decreased eye-hand-foot coordination (significantly below average); decreased manual dexterity, which improved with repetition; decreased balance; significantly decreased hand coordination, impaired eye-hand coordination, which did not improve with repetition.  (Tr. 290).  During the evaluation, she required additional time to initiate tasks

---

[5]      Kyphosis is:  (1) an anteriorly concave curvature of the vertebral column; (2) A forward (flexion) curvature of the spine; the thoracic spine normally has a mild kyphosis; excessive forward curvature of the thoracic spine may represent a pathologic condition.  STEDMAN'S at 955.

and establish movement patterns. Id. Suchanek's driving evaluation was significant for impairments in right lower extremity simple reaction time, and the ability to divide attention and perform a task. Id. Dr. Grogg opined that Suchanek may be able to function in a setting that allowed her to work at her own pace, but she would not do well in situations that require quick physical responses, timed tasks, or physical transitions, such as changing from sitting to standing. (Tr. 290). Based on limitations in transportation and her very limited work options, Dr. Grogg concluded that Suchanek was medically disabled. Id.

To help her succeed academically, Suchanek was given an accommodation plan by the University. (Tr. 307-11). She was provided a private room in the dorms, time-and-a-half to take exams with a distraction free environment, use of a word-processor for essay exams, services of a note-taker in classes, and priority registration to build a course schedule. (Tr. 307).

Suchanek met with Counselor Sharalyn Tschida for the first time on December 5, 2005. (Tr. 304-06). Suchanek went to Ms. Tschida to talk about how uncomfortable she felt living in the dorm at the University. (Tr. 304). Ms. Tschida noted that Suchanek was very shy, and she kept asking whether her questions were appropriate. (Tr. 305). Suchanek complained about the inability to get things done on time because her OCD symptoms caused her to take a long time dressing and cleaning up before going out. Id.

Suchanek complained that she had a difficult time making friends. (Tr. 305). She related that she did not accept invitations because it takes her such a long time to get ready, and she feared people would be angry with her for being late. Id. She did, however, have a good friend who accepted her the way she was. Id. Ms. Tschida helped

her work on her time management skills, and they developed a good therapeutic relationship by the end of the school year.  (Tr. 305-06).  Ms. Tschida noted improvement in Suchanek's assertiveness.  (Tr. 305).

In December 2006, Suchanek's work study supervisor, Gael Mericle, the Director of the Center for Academic Excellence at Minnesota State University, Mankato, wrote a letter describing Suchanek's difficulties in her part-time job.  (Tr. 144).  Ms. Mericle stated that Suchanek could not perform even minimal tasks, and her ability to focus was minimal.  Id.  She said, "[w]e basically had to have someone stand over her at all times just for checking in students as they came into the writing center."  Id.

### B.   The ALJ's Decision

The ALJ denied Suchanek's claim for disability in a decision dated May 7, 2007. (Tr. 14-20).  The ALJ found that, although Suchanek worked after her protective filing date of July 23, 2004, she did not work at a level consistent with substantial gainful activity.  (Tr. 14).  The ALJ found that Suchanek "is severely impaired by motor coordination difficulties, an obsessive-compulsive disorder, a non-verbal learning disability, a history of an eating disorder, and a history of depression[.]"  (Tr. 19).  The ALJ considered Suchanek's subjective complaints of working at a slow pace and lacking physical endurance.  (Tr. 14).  The ALJ found Dr. Grogg's opinion that Suchanek "might be able to function in a setting that allowed her to work at her own pace and would not require quick physical responses, timed tasks, or transitions from a physical standpoint such as changing positions from sitting to standing or climbing" inconsistent with complete disability.  (Tr. 15-16).

The ALJ noted that Suchanek can maintain her personal hygiene, at a slow pace, and can cook and clean, shop, go to church and bible study, attend college, and do volunteer work.  (Tr. 16).  The ALJ found this evidence to be inconsistent with a listing level severity of motor incoordination.  Id.  The ALJ concluded that the evidence was consistent with a residual functional capacity to perform work requiring lifting twenty pounds occasionally, ten pounds frequently, no continuous lifting, standing/walking six hours out of an eight hour workday, occasional climbing of stairs, ramps and ladders, no climbing of ropes or scaffolds, no climbing on ladders, occasional stooping or crouching, no crawling, no use of foot controls with either foot, occasional fine and gross manipulation, and unskilled work with brief and superficial contact with the public and co-workers, and no rapid or frequent changes in a work routine.  (Tr. 16, 20).

The ALJ next addressed Suchanek's mental impairments.  (Tr. 16).  The ALJ noted, "[t]he record contains primarily diagnostic assessments, however, and no ongoing mental health treatment directed toward these impairments, other than prescribed medication."  Id.  The ALJ also noted that Suchanek's symptoms of depression and obsessive-compulsive disorder improved with medication, without side effects.  Id.  The ALJ discounted the fact that the consultative examiner assessed Suchanek with a GAF score of 49 in November 2004, because Suchanek was not receiving any mental health therapy at that time.  Id.  The ALJ also found that the activities Suchanek described herself as performing were not consistent with a GAF score of 49, which indicates serious limitations.  (Tr. 16-17).

The ALJ also noted repeated references in the record to Suchanek's lack of motivation, but that Suchanek, nevertheless, was able to live independently in a dorm,

and complete school work with above average grades.  (Tr. 17).  The ALJ did not find the accommodations given to Suchanek at school to be very significant.  Id.

The ALJ discounted a statement from Suchanek's work study supervisor, which indicated that Suchanek was unable to perform even minimal tasks without direct instruction, no matter how many times it was repeated.  Id.  The ALJ noted this was inconsistent with Suchanek's academic achievement, and with Suchanek's vocational assessment in April 2005.  Id.  The ALJ noted the only work barrier in the April 2005 assessment was the lack of ability to understand social cues, and low work tolerance due to fragile health.  (Tr. 17-18).  The ALJ did not find evidence in the record that Suchanek was being treated for anything that could be characterized as fragile health.  (Tr. 18).[6]

The ALJ cited a vocational evaluation report, from KCQ, Inc., that Suchanek could perform work as a book seller, library page, or office clerk, with periodic supervision, a checklist for tasks of more than three to four steps, and a job coach for initial support.  Id.  The ALJ noted that the record suggested Suchanek would do well with a slower paced environment, and a variety of tasks, and that she could work with support in most jobs she pursued.  Id.  The ALJ noted that the support Suchanek would need was not anticipated as long term or excessive.  Id.  The ALJ stated, "[g]iven the claimant's ability to pursue college level education, with minimal academic supports, the undersigned finds these recommendations consistent with the ability to perform substantial gainful activity."  Id.

The ALJ found the state agency consulting medical sources' opinions of Suchanek's mental impairments to be consistent with the record, except for the fact the

---

[6]     The Court notes that Suchanek's "fragile health" was defined in the vocational assessment as meaning that she was diagnosed with an eating disorder, OCD, depression, and nonverbal learning disorder.  (Tr. 128).  The record supports these diagnoses.

ALJ found no episodes of decompensation in the relevant time frame.  Id.  Thus, the ALJ concluded that Suchanek did not meet a mental impairment listing, and would be able to perform unskilled work, with brief and superficial contact with the public and co-workers, and no rapid or frequent changes in work routine.  (Tr. 18-19).

## II.    ANALYSIS

Suchanek alleges the ALJ:  (1) failed to evaluate her nonverbal learning disorder under Listing 12.10(A)(2) [7]; (2) the Agency's consulting physician failed to review the entire medical record; (3) the ALJ erred by not granting controlling weight to Dr. Grogg's opinion; (4) the ALJ mischaracterized Suchanek's school and vocational evaluation records; (5) the ALJ's subjective analysis and residual functional capacity determination are not supported by substantial evidence in the record; (6) the ALJ failed to obtain a reasonable explanation for the VE's testimony, which conflicted with the DOT.  The Court will address these arguments within the framework of the five step disability evaluation process for supplemental security income, 20 C.F.R. § 416.920, beginning at step three, whether the ALJ properly analyzed whether Suchanek met or equaled Listing 12.10(A)(2).

### A.    Standard of Review

To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual

---

[7]    Suchanek also contends the ALJ erred by failing to obtain an updated medical expert opinion on medical equivalence.  This is incorrect.  An ALJ may rely on a Disabilty Determination and Transmittal Form or a Psychiatric Review Technique Form signed by a state agency medical or psychological consultant in support of a determination that a claimant does not medically equal a listed impairment. SSR 96-6p (2002 Supplementary Pamphlet) Soc. Security Reporting Service:  Rulings (West) at 131. The ALJ need only obtain an updated medical expert opinion if the ALJ finds that evidence in the record suggests that a judgment of medical equivalence may be reasonable or when additional medical evidence is received that may change the state agency medical or psychological consultant's opinion on medical equivalence.  Id.  The Court finds no such evidence in the record.

findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d 725, 727 (8th Cir. 1992.  The Eighth Circuit described this five-step process in Morse v. Shalala, 16 F.3d 865, 871, rev'd and remanded on other grounds, 32 F.3d 1228 (8th Cir. 1994):

> The first step asks if the claimant is currently engaged in substantial gainful employment.  If so, the claimant is not disabled.  If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.  If not, the claimant is not disabled.  If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled.  The fourth step asks if the claimant's impairments prevent her from doing past relevant work.  If the claimant can perform past relevant work, she is not disabled.  The fifth step involves the question of whether the claimant's impairments prevent her from doing other work.  If so, the claimant is disabled.

The Court should affirm the ALJ's decision if it is supported by substantial evidence.  42 U.S.C. § 405(g); Parsons v. Heckler, 739 F.2d 1334, 1339 (8th Cir. 1984).  Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  Id. (quoting Smith v. Schweiker, 728 F.2d 1158, 1162 (8th Cir. 1984).  The Court must review the record for evidence that supports, and evidence that detracts from, the ALJ's decision.  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).  The duty of deciding questions of fact, including credibility, rests with the Commissioner, and the Court should normally defer to the

ALJ's credibility determination if the ALJ gave good reasons for discrediting the claimant's testimony.  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

      **B.**        **Listing 12.10(A)(2) Other Pervasive Developmental Disorders**

A person will be considered disabled by a pervasive developmental disability under Listing 12.10(A)(2) when both of the following conditions apply:  (1) qualitative deficits in reciprocal social interaction; and (2) qualitative deficits in verbal and nonverbal communication, and in imaginative activity; and resulting in at least two of the following (1) marked restrictions in activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 404, Appendix 1, Subpart P, 12.10(A)(2) and (B).  The ALJ's failure to address a specific listing is not reversible error if the record supports the overall conclusion.  Pepper ex rel. Gardner v. Astrue, 342 F.3d 853, 855 (8th Cir. 2003).

Listing 12.10(A)(2) requires evidence of qualitative deficits in reciprocal social interaction; verbal and nonverbal communication, and imaginative activity, and Suchanek has not explained how she meets these criteria.  Plaintiff's neuropsychometric testing revealed that her verbal intelligence was average, and her nonverbal intelligence was borderline.  (Tr. 245).  Although her nonverbal learning is severely impaired, the psychometric tests do not establish qualitative deficits in reciprocal social interaction, verbal and nonverbal communication, or imaginative activity.  (Tr. 243-45).

Even if Plaintiff had established how she meets or equals the "A" criteria of the listing, she has not established that she meets the "B" criteria, that she has a pervasive developmental disorder that causes marked restrictions in two areas of functioning.

While the record supports marked restrictions in maintaining concentration, persistence, or pace, (Tr. 130, 170, 240, 289, 290, 295) it does not support marked restrictions in daily activities, social functioning, or two or more episodes of decompensation.  Suchanek engages in a range of daily activities, although it takes her longer than other people to do things (Tr. 217, 261-63), and functions well enough socially to have friends, attend college, attend bible study, and do volunteer work.  (Tr. 226, 263, 299).  Her one episode of decompensation, hospitalization at age thirteen for an eating disorder, does not satisfy the "B" criteria of repeated and extended episodes of decompensation.  The record supports the ALJ's conclusion that Suchanek does not meet or equal a listed impairment.

### C.    The Physicians' Opinions

The ALJ rejected Dr. Grogg's opinion that Suchanek is disabled, and credited the state agency consulting physicians' opinions that Suchanek has the ability to perform unskilled work, with brief and superficial contact with the public and co-workers, and no rapid or frequent changes in work routine.  (Tr. 15-16, 19).  Suchanek contends the ALJ should have granted controlling weight to Dr. Grogg's opinion of disability.

Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527.  In according weight to medical opinions, the ALJ should consider the following factors:  (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).

A physician's opinion that a claimant is disabled involves an issue reserved for the Commissioner, and is not the type of opinion the Commissioner gives controlling

weight.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (citing Stormo v. Barnhart,

377 F.3d 801, 806 (8th Cir. 2004).  "The Commissioner defers to a treating physician's

medical opinions about the nature and severity of an applicant's impairments, including

symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the

impairment, and the resulting restrictions."  Id. at 995 (citing 20 C.F.R. 404.1527(a)(2)).

A treating physician's opinion is typically entitled to controlling weight if it is

well-supported by "medically acceptable clinical and laboratory diagnostic techniques[.]"

Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel,

201 F.3d 1010, 1012-13 (8th Cir. 2000)).  As a general rule, the report of a consulting

physician does not constitute substantial evidence on the record as a whole upon which

the ALJ may rely to credit the consulting physician's opinion over the opinion of a

treating physician.  Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007).   Although the

ALJ did not err in rejecting Dr. Grogg's opinion of disability because that issue is

reserved for the Commissioner, the ALJ erred by not granting controlling weight to

Dr. Grogg's opinions of the nature and severity of Suchanek's impairments, and the

resulting restrictions from her impairments.  See Ellis, 392 F.3d at 995 (describing when

deference should be given to treating physician's medical opinion about the nature and

severity of symptoms).  Dr. Grogg is a specialist in Physical Medicine and Rehabilitation

at Mayo Clinic, and is uniquely qualified to give an opinion on Suchanek's functional

physical limitations.  Although he treated Suchanek only twice, the quality of evidence

upon which he bases his opinion, review of Suchanek's medical records, his personal

interviews with and examinations of Suchanek, and review of Suchanek's standardized

driver's evaluation and standardized physical performance evaluation, are very relevant

to the disability determination.  Dr. Grogg's opinion is based on objective clinical findings on standardized physical tests.

Dr. Grogg opined, "[Suchanek] has significant physical limitations as far as decreased reaction time, decreased ability to initiate tasks, and impaired hand-eye coordination."  (Tr. 289).  He further opined that she would not do well in situations that require quick physical responses, timed tasks, or physical transitions, such as changing from sitting to standing.  (Tr. 290).  Dr. Grogg's opinion was based on Suchanek's physical performance evaluation, which was significant for decreased eye-hand-foot coordination (significantly below average); decreased manual dexterity, which improved with repetition; decreased balance; significantly decreased hand coordination, impaired eye-hand coordination, which did not improve with repetition.  Id.  During the evaluation, she required additional time to initiate tasks and establish movement patterns.  Id. Dr. Grogg's opinion is also based on findings from the driver's evaluation, which indicated that Suchanek is impaired in right lower extremity simple reaction time, and the ability to divide attention and perform a task.  Id.

Furthermore, Dr. Grogg's opinion is consistent with other objective evidence in the record including psychological tests results in 1994, which indicated that Suchanek showed deficits in fine motor skills, visual perceptual problems, gross motor skills, and significant difficulties with attention and concentration, especially with rapidly presented tasks.  (Tr. 170).  Dr. Grogg's opinion is consistent with findings of psychometric testing in 2002, which indicated significant discrepancies between Suchanek's verbal and nonverbal learning patterns, borderline auditory attention span, and marked difficulties in informational processing speed and motor function.  (Tr. 240).  It is also consistent with

KCQ Inc.'s vocational assessment, which indicated Suchanek's work rate was slow, and "she would need a slower paced environment," and Dr. Holmen's opinion that she could carry out basic repetitive tasks *at a reduced pace*.  (emphasis added)  (Tr. 127, 130, 265).

An ALJ's residual functional capacity determination is not supported by substantial evidence in the record when the ALJ did not include all of the claimant's functional limitations, as provided in a controlling treating physician's opinion, and must be remanded for further proceedings.  Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000).  In the hypothetical question posed to the vocational expert, the ALJ did not include all of Suchanek's functional limitations, as described by Dr. Grogg.  Specifically, the ALJ did not include facts that Suchanek had decreased reaction time, decreased ability to initiate tasks, impaired hand-eye coordination, and could not do work that requires quick physical responses, timed tasks, or physical transitions, such as changing from sitting to standing or climbing.  Importantly, although the ALJ seemed to accept Dr. Grogg's opinion that Suchanek could only work at her own pace (Tr. 15-16), the ALJ did not include any limitations in Suchanek's residual functional capacity to accommodate her slow work rate.  The Court notes that the ALJ characterized Suchanek's complaint that she is unable to work due to slow work pace as a subjective complaint.  (Tr. 14).  However, the record contains objective evidence of Suchanek's slow processing speed (Tr. 240), deficits in motor skills (Tr. 159, 170, 240), and difficulties with attention and concentration when rapidly presented with tasks (Tr. 170).

Because Dr. Grogg's opinion is entitled to controlling weight, and the ALJ did not include all of Suchanek's functional limitations described by Dr. Grogg in Suchanek's residual functional capacity, the ALJ's decision is not based on substantial evidence.

Therefore, the case should be remanded with instructions to grant controlling weight to Dr. Grogg's opinion.  Furthermore, the ALJ should obtain vocational expert testimony based on a hypothetical question that includes all of the functional limitations, and the nature and severity of Suchanek's symptoms, as opined by Dr. Grogg and described above.

## III.    CONCLUSION

The ALJ's finding that Suchanek does not meet or medically equal a listed impairment is supported by substantial evidence in the record.  However, the ALJ erred by not granting controlling weight to Dr. Grogg's opinion of the nature and severity of Suchanek's symptoms, and her resulting functional limitations.  The case should be remanded with instructions to the ALJ to obtain vocational expert testimony regarding Suchanek's ability to perform work, give her symptoms and limitations as described by Dr. Grogg.

## IV.    RECOMMENDATION

IT IS HEREBY RECOMMENDED THAT:

1.    Plaintiff's Motion for Summary Judgment be DENIED; [Docket No. 8];

2.    Defendant's Motion for Summary Judgment [Docket No. 14] be DENIED.

3.    The matter be REMANDED to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated:  November 4, 2008                       _s/ *Jeanne J. Graham*_____
                                                                       JEANNE J. GRAHAM
                                                                       United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **November 18, 2008.**  A party may respond to the objections within ten days after service.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The District Court shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.